## Staunton.

## CONNECTICUT FIRE INSURANCE CO. v. W. H. ROBERTS LUMBER CO.

September 11, 1916.

Absent, Cardwell, P.

1. FIRE INSURANCE—*Profits—Case at Bar.*—The character of a contract of insurance of property or interests in property itself is very different from a contract of insurance of profits to arise from the dealing with such property. The former is an indemnity against loss of existing property interests at the time of loss by fire; the latter is an insurance of expected interest and profits at the time of loss by fire. The former concerns what is in actual existence; the latter what is only potentially in existence. A policy of insurance will not be held to cover profits unless the purpose to do so is expressly stated in the policy. Even if the policy sued on in the case at bar had contained the language "any interest in the lumber," etc., along with the other language of the policy designating the subject of insurance, it could not be construed to cover expected profits

2. FIRE INSURANCE CONTRACTS—*Construction—Parol Evidence.*—The same rules of construction which apply to other contracts apply also to insurance contracts. The policy is to be construed according to its terms. There can be no resort to parol evidence except in case of latent ambiguity. In the case at bar, if the utmost effect were given to the evidence in behalf of the plaintiff, it does not show that profits were intended to be covered by the policy. No profits were at any time mentioned, or ever considered, or thought of by the plaintiff or the agent of the defendant prior to the loss by fire.

3. APPEAL AND ERROR—*New Trial Unavailing—Dismissal of Action.*—In reversing a judgment for the plaintiff because there was no evidence to support the verdict upon which the judgment was entered, where this court can see that no new tiral could avail the plaintiff anything, it will enter such judgment as the trial court should have entered, dismissing the plaintiff's action.

Error to a judgment of the Circuit Court of Wise county in an action of assumpsit.   Judgment for the defendant.   Plaintiff assigns error.

*Reversed.*

The opinion states the case.

*Morison, Morison & Robertson,* for the plaintiff in error.

*E. M. Fulton* and *Chapman, Peery & Buchanan,* for the defendant in error.

SIMS, J., delivered the opinion of the court.

In this case the judgment complained of in favor of the appellee, plaintiff in the court below, against appellant, defendant in the court below, was obtained upon a fire insurance policy, referred to in the record as a "floating policy," being what is designated by text-writers on the subject as an open, floating, or blanket policy, and the judgment was for the amount of the plaintiff's expected profits in certain lumber, which lumber was covered by the policy.

There are four assignments of error, but in the view we take of the case we need consider only one inquiry, and that is—

(1)   Did the policy sued on cover the profits of the plaintiff in the lumber in question?

The material parts of the policy sued on are as follows:

"No. 1055.

"THE CONNECTICUT FIRE INSURANCE COM-
PANY OF HARTFORD.

"STATE OF CONNECTICUT.

"Amount $8,000.00   Rate $1.50   Premium $120.00

"In consideration of the stipulations herein named and of One Hundred and Twenty Dollars premium, does insure W. H. Roberts Lumber Company for the term of one year from the twenty-fourth day of June, 1913, at noon, to the twenty-fourth day of June, 1914, at noon, against all direct loss or damage by fire, except as hereinafter provided, to an amount not exceeding Eight Thousand Dollars, to the following described property. while located and contained as described herein, and not elsewhere, to-wit:

"W. H. ROBERTS LUMBER Co.

"$8,000.00. On lumber, staves and timber products of every description now owned or which may be hereafter manufactured, or held in trust or on commission, or sold but not delivered or removed, or lumber, staves and timber products of every description on which advances are made under contract of purchase, while stacked or piled at various mill sets or yards, or at shipping points, in the counties of Wise and Lee, State of Virginia.

.    .    .    .    .    .

"It is understood and agreed that the amount insured by this policy shall attach in each of the above named premises in that proportion of the amount hereby insured that the value of the property covered by this policy contained in each of the said places shall bear to the value of such property contained in all of the above named premises.

"   .   .   .   Lightning, Iron safe   .   .   .   clauses attached.

31

"Attached to and forming part of Policy No. 1055 of the Connecticut Fire Insurance Company of Hartford; Conn.

"VIRGINIA-KENTUCKY INSURANCE CORPORATION,
By R. L. KILGORE, Sect.,
"Agents.

"LIGHTNING CLAUSE.

"It is hereby specifically agreed that this policy insures against any loss or damage caused by lightning to the proporty insured, not exceeding the sum insured, nor the interest of the assured in the property; . . ."

It is clear from a reading of the policy itself that it does not insure profits. The terms used in the policy defining the subject of the insurance are those which have a well settled meaning, and contract, in effect, to insure the interests of the plaintiff of whatever character, in the lumber itself, existing at the time of the loss by fire, and not profits which might arise from the dealing of the plaintiff with such lumber.

The character of the contract of insurance of property, or an interest or interests in property itself, is very different from a contract of insurance of profits to arise from the dealing with such property. The former is an indemnity against loss of existing property interests, at the time of the loss by fire; the latter is an insurance of expected interests, at the time of the loss by fire, viz: profits. The former concerns what is in actual existence, the latter what is only potentially in existence. And the text-writers and decisions of the courts seem to be uniform in their expression of the rule, that a policy of insurance will not be held to cover profits unless the purpose to do so is expressly stated in the policy. The difficulty is not that profits

Conn. Fire I. Co. *v.* Roberts, 119 Va. 479. 483

Opinion.

may not be insured. They may. It is solely a question of what in fact is the contract of insurance.

The following named text-writers have this to say on the subject of profit insurance:

"Expected profits may be insured, both in this country and in England . . But the insured must have an interest in the property out of which the profits are expected to proceed, and the profits must be insured as profits. . . And such expected profits are still insurable though the insured may have no absolute ownership in the property out of which the profits are expected to arise, but merely a right, if he should so elect, to take it on certain terms and conditions in a certain event . . " 1 May on Ins., sec. 79, citing a number of cases.

"An insurance may be validly made on profits. Profits should be specifically described, whether the property be insured under a marine or fire risk, and this rule is unquestionably the law in England. Lloyds form of policy is adopted as usual by the insertion of the words 'profits' or 'commissions' in the margin; or in the valuation clause adopting or adapting the language of the clause according as the subject of the insurance is valued or not." 2 Joyce on Ins., sec. 1760, citing a number of English and American cases.

"It may be stated as a rule that if profits are not specially insured they cannot be recovered as such." 3 *Idem*, sec., 2806, citing a New York case.

"While the subject matter of insurance and the nature of the risk should be properly described in the policy, neither the nature nor extent of the interest need, as a general rule, be specifically set out therein . . . It is held that in certain cases the nature or character of the interest may be such as that a special description is required. Thus, it seems that profits

must be insured as such." 2 *Idem*, sec. 900, citing a number of American cases. See also 19 Cyc. 840, and cases cited.

Counsel for plaintiff in their brief, in effect, admit that this rule is applicable and that if the policy sued on is looked to alone it does not insure profits, but they take the position that "the intent of the parties was to give the insured valid insurance upon whatever interest he had or might have under contracts of purchase or otherwise," in the lumber in question— and they cite the following authority:

"*Intention to be taken into account.*—Policies should be construed so as to give effect to the evident intention of the parties.

"*Liberal construction in favor of insured.*—The policy of insurance being an instrument prepared by the insurer should, in case of doubt under the general rules, be construed strictly against the insurer who prepared it, and liberally in favor of the assured. This is the rule, even though the intention of the company is otherwise." 19 Cyc. 656-7.

In a note, page 656, this language appears: "If there is any doubt or uncertainty under the terms of the policy as to the intent of the parties, it is to be resolved in favor of the insured."

And counsel for plaintiff refer to the testimony on this point of the plaintiff, Mr. Roberts, and of Mr. Fulton, former general manager of the corporation which was the insurance agent which solicited and first placed the insurance for plaintiff in the form of a floating or blanket policy with the defendant—which insurance was afterwards renewed through the same agent acting by another general manager, Mr. Kilgore, and the policy sued on issued by the latter. The

testimony of Mr. Roberts and Mr. Fulton, referred to, is as follows:

Mr. Roberts testified:

Q. Did the insurance agent at the time of the issuance of this policy understand your situation and the purpose for which you were taking the policy?

.    .    .    .    .

A. Yes, it was thoroughly gone over by him and discussed that this floating policy would take care of any interest I bought or had in lumber in the two counties. I paid more for it, a higher premium as I understood, to get it—I had so many yards. If I had not understood it that way I positively would not have taken the policy, because it would have been worthless to me.

W. H. Roberts (recalled for further cross-examination) further testified as follows:

By Mr. Irvins:

Q. Mr. Roberts, you referred in your former examination to a conversation you had with an insurance agent in which you understood all your interests in this lumber were covered before this policy was issued, who was that agent?

A. It was Claude Fulton. The first talk I had was with Mr. Hurt on the train is my remembrance of it, and then I was taking all my insurance with the agency here at Wise, Virginia-Kentucky, and Claude Fulton was solicitor, and I took it up with him.

Q. Mr. Hurt did not represent the Connecticut Fire Insurance Company?

A. No, sir, not that I know of.

Q. Did Mr. Claude Fulton, or the agency he represented, represent the Connecticut Fire Insurance Company?

A. At that time I could not state.

Q. When was that?

A. To the best of my opinion, it was either in 1911 or 1912.

Q. You do not claim to the jury that it was at the time this policy now sued on was taken out, or the one referred to here of the year preceding?

A. I don't know that it was. I depended on the agency giving me the same policies, renewing them, as was first given me; we first took out. As to looking at each one of the policies I don't remember how it was, whether there was anything said about the policies after we got what they called a "Floating policy."

Q. Did you ever have a floating policy in any other company except the Connecticut Fire Insurance Company?

A. Yes, I think they gave me one in some others first.

Q. You had several others?

A. I don't remember how many. For each year I took a policy for eight thouasnd dollars; I think they put it in two companies.

Q. Did you not have a policy in one or two companies in which the words "all your interest" were written in its typewritten part of the policy?

A. Yes, after looking at the policy I noticed it was in there; I supposed it was in this policy; I supposed the policies were all the same.

Q. Wasn't one or more of these policies subsequently cancelled on you because of the words "all your interest," or "their interest" appearing in it?

A. No, sir, if ever a policy was cancelled for that it was not brought to my attention; I have no recollection of it. Sometimes they would come to me and say that they were going to put it in another company, but I left it to be the Wise, Virginia, agency. I thought

they were all about the same and I had no choice as to what company I got it in, and why they did it I didn't know.

Mr. Fulton testified:

Q. While you were manager of that agency did you have any conversation with Mr. Roberts about a "Floater policy" on his lumber yards?

A. Yes.

Q. What?

A. I had written Mr. Roberts some insurance; he had given us all his insurance business, and I had written him policies on shorter periods than one year, sixty or ninety days, sometimes four months on certain yards of lumber; I had been doing that and I suggested to Mr. Roberts that a better plan would be to take out a floating policy covering all the interests he had in lumber and let him have it all in one policy. I told him I had talked the matter over with Mr. Hurt. Mr. Hurt was pretty well up on insurance business and he informed me that such a policy could be written and I looked it up and I thought so too myself, that he could get a policy covering any interest he had in any lumber he might buy; he would buy lumber and take a policy of insurance on it, and sometimes we would put a "loss payable clause" in it payable as interest appeared and I told him I thought he would save money by taking a policy and carrying it year in and year out, a blanket policy.

Q. Was there any conversation passed between you as to any policy covering all his interest and profits or anything like that?

A. All his interest were covered. That was the intention of the policy I told him we could write. The word "profits" was not mentioned in it.

Q. Did you in fact write him a policy with all his interest appearing in it?

A. Yes, I think so.

Q. Was that cancelled?

A. I think I have that record here somewhere. (Witness looks at papers.) On January 13, 1912, I issued two policies to Mr. Roberts; that was the first time I undertook to issue to him policies for a year, for four thousand dollars each in that form.

Q. What is that form?

A. Policy No. 60120 in German Alliance Insurance Association, policy No. 597348 in Globe Rutgers Fire Insurance Company, issued January 13, 1913; then on February 10, 1912, I issued policy No. 307307 in the Monongahela Underwriters Agency to take the place of policy No. 60120 in the German Alliance and afterwards took up policy No. 307307 in the Monongahela and wrote policy No. 307315 in the Monongahela Underwriters covering the whole thing placing the whole thing with them. That went on about three months and I cancelled that policy and rewrote the policy for eight thousand dollars in the Connecticut Fire Insurance Company.

Q. When was that written?

A. June 24, 1912.

Q. Have you the form of that policy there?

A. Yes.

Q. When did the Connecticut Fire Insurance Company fire come into your office?

A. I don't remember the exact date.

Q. This was the first policy in June, 1912, that you wrote with them in connection with Roberts?

A. My recollection is they had only been with us a short while when I wrote that policy.

Conn. Fire I. Co. *v.* Roberts, 119 Va. 479.  489

Opinion.

Q. The Globe Rutgers and German Alliance and Monongahela all seem to read "on lumber, staves and timber products of every description, their interest in lumber, staves, and timber products of every description, now owned or held in trust, or on commission, or sold, but not delivered, or removed, while staked or piled at various mill sets or yards, or at shipping points, in the county of Wise, Lee, Dickenson, and Scott, State of Virginia." Is that correct?

A. That is the way I remember it.

Q. I will ask you to look at the memoranda which you handed me and state if I read it correctly?

A. Yes, that is correct.

Q. Were these policies cancelled that you just referred to as having been written in the Globe and Rutgers, German Alliance and Monongahela Underwriters?

A. Yes, the Globe and Rutgers cancelled because I exceeded their line they would accept on lumber; I really didn't do it, but that was the reason they gave for cancelling and as well as I remember German Alliance cancelled also.

Q. Why did they cancel?

A. I do not remember, but my impression is lumber losses had been rather heavy in this section up to that time and the companies begin to get kindly scared of them; I know several of the companies were.

Q. Why did the Monongahela cancel?

A. I think the Monongahela had a loss under that policy and when we settled that loss—they perhaps had another loss here—they cancelled that policy and I believe withdrew from this territory; that is my remembrance, but I am not so positive of that.

Q. Now I ask you to examine the memoranda just handed me as covering what was insured by the Con-

necticut Fire Insurance Company under their policy of June, 1912, and state if that is any different in the contracting clause from the policy sued on in this case, or rather I will read it to you: "On lumber, staves, and timber products of every description now owned, or which may be hereafter manufactured or held in trust, or on commission, or sold but not delivered or removed, while staked or piled at various mill sets or yards, or at shipping points in the counties of Wise, and Lee, State of Virginia."

Mr. Fulton: That don't cover it.   Here is the policy itself.

Mr. Peery:  On which advances are made under contract of purchase.

Q.   (Continued.)   The clause I have just read is the same as the other except the other clause includes "on which advances are made under contract of purchase," is it not?

Mr. Peery: The policy speaks for itself.

A.   I did not have anything to do with the last policy.

Mr. Peery:  Are you asking if they are the same? They are not the same.

Q.   The point I want to get at is this:  It does not contain the words "interest in lumber?"

A.   No, sir.

Q.   Did you have at any time a discussion with Mr. Roberts about whether or not it covered his entire interest in lumber, this Connecticut Fire Insurance policy?

A.   As I stated, I could not say how it came about. My idea was as I had talked to Mr. Roberts to insure his interest in lumber under that blanket policy that he would buy at various places around and the lumber he had at mill sets, and that would do away with the

issuing of so many policies and the making of so many entries on my register.

Q. When was that talk you had with Mr. Roberts, do you remember?

A. Well, I talked it over with him various times.

Q. Do you know whether you had any such talk with him at the time you issued the Connecticut Fire Insurance policy?

A. I could not say.

By Mr. Morison:

Q. Mr. Fulton, do you know what date you began doing business for the Connecticut Fire Insurance Company as agent?

A. I could not state, but evidently a short time before this policy No. 1006 was issued, had only issued five policies before that. This was the sixth policy.

Q. I believe you stated that you sold out your interest in the agency in December of that same year?

A. Yes.

Q. And had no further connection with the agency after the first of the year?

A. No, sir.

Cross-examination.

By Mr. Peery:

Q. Mr. Fulton, the Virginia-Kentucky Insurance Corporation was the local agent for a number of Fire Insurance Companies was it not?

A. Yes, I think we had four or five at this time, perhaps six.

Q. As I understand you, Mr. Roberts had been taking these short term policies covering his interest in lumber manufactured by him or upon which he had contracts of purchase and these policies cost more than the longer term policies?

A.   They were taken at the short rate.

·   ·   ·   ·   ·   ·

Q.   He discussed the matter with you and explained to you his situation, how he was buying lumber, how he was manufacturing it, and you advised him that you could give him a blanket contract covering insurance on his interests in the lumber manufactured or bought by him?

A.   Well, we talked it over numbers of times, I don't remember the exact conversation, but that was my idea and his idea too, as I gathered from what·he said.   I think one time Mr. Hurt was over there when we discussed and I think I asked him if that would cover it, this form, and I think he said that was about the form other agencies used.

Q.   Other dealers in lumber situated like Mr. Roberts?

A.   I think that was just the conversation.

Q.   Mr. Roberts left it to your agency as to what company or companies you would place his insurance in?

A.   Yes, invariably did.   We did all his insurance business practically and placed it in any company that we wanted to, and I never did hear any kick about it.

·   ·   ·   ·   ·   ·

Q.   Now, Mr. Fulton, the Virginia-Kentucky Insurance Corporation was authorized to issue and deliver policies without sending them in to the company, was it not; in other words, when a man applied to you for insurance you would simply take a blank form of policy and sign it as agent and deliver the policy?

A.   Yes.

Q. You had authority to do that from the companies you represented?

A. Yes.

Q. You had such authority from the Connecticut Fire Insurance Company?

A. Yes.

Q. This policy which delivered on behalf of the Connecticut Fire Insurance Company, that is the first one was delivered by you to Mr. Roberts with the idea of insuring all of his interest in lumber manufactured by him or upon which he had contracts. Is that correct?

A. Well, my idea was to issue a blanket policy so as to cover the lumber at his mill sets, various places in the country, as I have told you about how it was done.

By Mr. Morison:

Q. When you issued and delivered a policy as described by Mr. Peery, did you or not have to send a copy of the part you filled in to the company?

A. Yes.

Q. Was that a matter of daily reports?

A. Yes. As well as I remember we had a typewritten form and we would make three copies, one for the agency, one for the company and one for the policy.

Q. If the company did not approve of the form you wrote up, what would it do?

A. Well, I don't know so much about the form, but if they didn't want the insurance on the property they would request us to cancel it; if they didn't like the form they would request that we change the form.

By Mr. Peery:

Q. You say you placed this insurance in the Monongahela and then you placed it in the Connecticut. Were you endeavoring to follow the same form that

you had in the policy that was first issued for Mr. Roberts?

A. I would not say positively about that, because I have no distinct remembrance. I see that I did not follow it, but I don't remember why it was now. I tried to find the correspondence about it before that, but my brother and Mr. Kilgore destroyed all the correspondence we had before 1912 about the matter and I could not find it to refresh my memory about it, and I could not say about that.

Mr. Kilgore testified on the subject as follows:

By. Mr. Irvins:

Q. Mr. Kilgore, did you become manager of the Virginia-Kentucky Insurance Corporation January 1, 1913?

A. I did.

Q. Did you write the policy sued on for that agency on behalf of Mr. Roberts in this case?

A. I did.

Q. Was there ever any talk between you and Mr. Roberts about what this policy covered, either the one sued on or the one for the year preceding this, 1913-1914?

A. Not that I think of. A few days before that policy expired I gave him the usual notice and asked him to renew the policy and he requested the renewal and in renewing the policy I copied the form from the policy for the year preceding it, the only difference being the date of expiration.

Q. The one sued on is a copy of the one for the year preceding?

A. Yes.

The general rule in Virginia on the subject of the admissibility of parol evidence upon the construction of policies of insurance is well settled.

"*Insurance Contracts—Construction.*—The same rules of construction which apply to other contracts apply to these. The policy is to be construed according to its terms. There can be no resort to parol evidence except in case of latent abbiguity." *Home Ins. Co.* v. *Gwathmey*, 82 Va. 923.

But if the parol evidence in this case were admissible on the ground that the policy sued on was prepared by the agent of the defendant and *by mistake* was written differently from the contract of insurance as in fact made by the plaintiff and such agent, so as to raise an equitable estoppel against the insurance company which may be effectually asserted by the insured in a court of law, under the doctrine of *Hedley* v. *German, &c. Ins. Co.*, 55 W. Va. 342, 47 S. E. 101, 2 Ann. Cas. 99—which question, however, we do not mean to decide, because not necessary for the decision of the case at bar—still if the utmost effect will give to the evidence in behalf of the plaintiff, under the rule applicable upon a demurrer to evidence, the parol evidence in this case does not show that there was a meeting of the minds both of the plaintiff and defendant (the latter acting through its agent) with respect to the contract of insurance, beyond the intention that the policy of insurance should insure against all loss or damage by fire "any interest" the plaintiff "bought or had in the lumber" in question at the time of its destruction by fire. No "profits" were at any time mentioned, or, so far as the record shows, were ever considered or thought of by the plaintiff or the agent of the defendant, prior to the loss by fire. Even if the policy sued on had contained the language, "any interest in lumber," etc., along with the other language in the policy designating the subject of the insurance, it could not be construed to cover expected

profits.   For the policy to cover the latter, it must expressly appear therefrom that profits were insured.

Such being our view of the case, and the evidence showing that the plaintiff could have sustained no loss by the fire except expected profits, so that no new trial could avail the plaintiff anything, this court will set aside the verdict and reverse the judgment complained of, because there is no evidence in the case to sustain it, and will enter such judgment as the court below should have entered, dismissing the plaintiff's action.

*Reversed.*